## In re VIVENDI UNIVERSAL, S.A. SECURITIES LITIGATION

No. 02 Civ. 5571(HB).

United States District Court,
S.D. New York.

Nov. 3, 2003.

## OPINION & ORDER

BAER, District Judge.[1]

### I. INTRODUCTION

Plaintiffs[2] allege that defendants sold them Vivendi Universal, S.A. ("Vivendi") common stock or American Depository Shares ("ADSs") at artificially inflated prices as a result of defendants'[3] material misrepresentations and omissions between October 30, 2000 and August 14, 2002, inclusive, (the "class period") in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"). Furthermore, plaintiffs allege that defendants induced them to purchase or otherwise acquire Vivendi common stock or ADSs (the "merger subclass") pursuant to a registration statement and prospectus dated October 30, 2000 (the "registration statement"), which was issued in connection with the three-way merger of Vivendi, Seagram Company Limited ("Seagram") and Canal Plus, S.A. ("Canal Plus") on December 8, 2000 (the "merger"), in violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"). In addition, plaintiffs allege that they were damaged as a result of the merger (the "proxy subclass") between Vivendi, Seagram, and Canal Plus, in violation of § 14(a) of the 1934 Act and SEC Rule 14a–9 promulgated thereunder. Compl. ¶¶ 1, 29, 40. Defendants in this securities class action move to dismiss the Consolidated Class Action Complaint (the "complaint") pursuant to 15 U.S.C. § 78u–4 (1995), and Rules 8, 9(b), 12(b)(1), 12(b)(6) and 41(b) of the Federal Rules of Civil Procedure. For the reasons stated below, defendants' motion is denied in part and granted in part.

### II. STANDARDS OF REVIEW

When construing a motion to dismiss under the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u–4, the Court must determine if plaintiffs pled with particularity sufficient facts "to support a reasonable belief as to the misleading nature of the statement or omission." *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 330 (S.D.N.Y. 2003) (quotation marks and citations omitted); *see Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.2000); 15 U.S.C. § 78u–4(b)(1). Moreover, the Court must determine if plaintiffs "state[d] with particularity facts giving rise to a strong inference that ... defendant[s] acted with the required state of mind." *In re IPO*, 241 F.Supp.2d at 330; *see* 15 U.S.C. § 78u–4(b)(2).

Under Rule 8, the complaint merely needs to "afford [the] defendant sufficient notice of the communications complained of to enable him to defend himself." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (quotation marks and citations omitted). Furthermore, the complaint must "be so construed as to do substantial justice." Fed.R.Civ.P. 8(f). The facts alleged must be "simple, concise, and direct." Fed.R.Civ.P. 8(e)(1).

---

1. Sirimal R. Mukerjee, an intern in my chambers during the summer of 2003 and a second-year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this opinion.

2. "Plaintiffs" refer to the lead plaintiffs (Oliver M. Gerard, Francois R. Gerard, Beatrice Doniger, Bruce Doniger, Grandchildren's Trust by Bruce Doniger Trustee, Alison Doniger, Michael Doniger, Edward B. Brunswick and the Ruth Pearson Trust) representing themselves and others similarly situated within the putative class.

3. "Defendants" refer to Vivendi Universal, S.A. ("Vivendi"), Jean–Marie Messier and Guillaume Hannezo. Messier and Hannezo will be referred to collectively as the "individual defendants."

Rule 9(b) adds to the pleading standard of Rule 8, but does not drastically alter it. *See In re IPO*, 241 F.Supp.2d at 326 (noting that Rules 8's and 9's "pleading requirements only differ in degree, not in kind"). When fraud is alleged, plaintiffs must allege facts with particularity. Particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.* at 327 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)).

Defendants' motions to dismiss under Rule 12(b)(1) challenges this Court's statutory or constitutional power to adjudicate the case. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). When considering a Rule 12(b)(1) motion, the Court construes the complaint broadly and liberally in conformity with the principle set out in Rule 8(f), "but argumentative inferences favorable to the pleader will not be drawn." 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure 1350, at 218–219 (1990 & Supp. 1991). The movant and the pleader may use affidavits and other materials beyond the pleadings themselves in support of, or in opposition to, a challenge to subject matter jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1130 (2d Cir.1976), *cert. denied sub. nom.*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Once challenged, the burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *See Thomson v. Gaskill*, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942). Unlike a motion to dismiss under Rule 12(b)(6), however, a dismissal under Rule 12(b)(1) is not based on the claim's merits. *See Exchange Nat'l Bank*, 544 F.2d at 1130–1131.

When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all of the facts alleged in the complaint and draw all reasonable inferences in the plaintiffs' favor. *See Krimstock v. Kelly*, 306 F.3d 40, 47–48 (2d Cir.2002). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 63 (2d Cir.1997) (citations and internal quotations omitted). It is improper, however, " 'to assume that the [plaintiffs] can prove facts that it has not alleged.' " *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir.2001) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

The Court has broad discretion to dismiss a complaint under Rule 41(b). *See Joseph Muller Corp. Zurich v. Societe Anonyme De Gerance Et D'Armement*, 508 F.2d 814, 815 (2d Cir.1974). "No one standard or single factor controls a court's determination under Rule 41(b); each case must be examined in its own factual circumstances." *S.E.C. v. Everest Mgmt. Corp.*, 466 F.Supp. 167, 171 (S.D.N.Y.1979) (citing *Michelsen v. Moore–McCormack Lines, Inc.*, 429 U.S. 394, 395 (2d Cir. 1970)). "In reaching its conclusion, a court may balance the strong public policy in favor of deciding cases on the merits with the burden on the administration of justice and prejudice to the defendant caused by the delay." *Id.* With these standards in mind, I review defendants' motions to dismiss.

## III. FACTUAL ALLEGATIONS

Vivendi is a global conglomerate comprised primarily of two major divisions:

"Media and Communications" and "Environmental Services." Compl. ¶ 30. Beginning in June 1996, Vivendi began an acquisition spree, with Messier, Vivendi's Chief Executive Officer ("CEO") and Chairman until July 3, 2002, and Hannezo, Vivendi's Chief Financial Officer ("CFO") until July 9, 2002, at the helm. This growth strategy resulted in the accumulation of a sizeable debt. After Vivendi acquired Seagram for $36 billion and Canal Plus for $12 billion, Vivendi purchased substantial equity positions in a host of other companies, including Houghton Mifflin Co., Studio Canal and USA Network Entertainment, using Vivendi stock or by borrowing against future earnings. *Id.* ¶¶ 52–53. Pursuant to this growth strategy, plaintiffs allege that "it was crucial for defendants to continue to report favorable financial results in order to keep Vivendi's stock price high and to maintain its favorable credit ratings and access to additional debt financing." *Id.* ¶ 53.

Plaintiffs allege that throughout Messier's and Hannezo's terms at Vivendi, Vivendi and the individual defendants issued public statements indicating that Vivendi's financial results were "better than expected." For example, in a March 9, 2001 and a March 12, 2001 press release, Vivendi reported that its fiscal year 2000 results had exceeded expectations. *Id.* ¶ 58–59. In an April 23, 2001 press release, Vivendi stated that its first quarter 2001 results were "very strong" and that its Media and Communications revenues and Telecoms revenues were up. *Id.* ¶ 61. At a shareholders' meeting held the following day, Messier stated that according to Hannezo's calculations, Vivendi had a "healthy balance sheet" and a "pro forma net debt that [was] practically non-existent." *Id.* ¶ 62. On July 2, 2001 Vivendi filed a Form 20–F for fiscal year 2000, which Hannezo signed and which contained consolidated financial statements for 1998, 1999, and 2000. *Id.* ¶ 66. Subsequently, Messier stated in a press release that Vivendi's earnings before interest, taxes, depreciation, and amortization ("EBITDA") had the "highest growth rate[ ] of the industry . . . [and that its] stock is definitely an attractive investment today." *Id.* ¶ 67–68. Because of such statements, Vivendi's common stock and ADSs increased in price by 5%, *id.* ¶ 70, and securities analysts gave Vivendi high credit ratings, *id.* ¶ 71.

Plaintiffs further allege that in response to market rumors that Vivendi's earnings would be disappointing, defendants "categorically denied any problems." *Id.* ¶ 73. For example, in a September 25, 2001 press release, Messier maintained that "[d]espite the current environment, [Vivendi would] reach all [of its] previously stated revenue/EBITDA objectives for the 2001 year." *See id.* ¶ 74. In an October 30, 2001 press release, Messier proclaimed the strength of Vivendi's reported revenue and EBITDA growth as a testament to Vivendi's resilience during a tough economy and that he expected 10% revenue growth and 35% EBITDA growth in 2001. *Id.* ¶ 75. Once again, securities analysts responded positively to defendants' statements. *Id.* ¶ 77. During a press conference in connection with Vivendi's $10.3 billion acquisition of USA Networks Entertainment and the creation of Vivendi Universal Entertainment ("VUE"), Messier indicated that the acquisition would not put "pressure" on Vivendi but would allow it to increase its EBITDA, net income and net free cash flow. *Id.* ¶ 81. Moreover, Messier emphasized that despite its global debt ratio, "the balance sheet [was] clean." *Id.* Furthermore, as reported by *AFX News Limited* on February 6, 2002, Messier distributed a company letter noting that "[s]ome global markets, including the music market, declined during this period. But despite the difficulties, we are the only

media company not to have issued a profit warning on its operating results and there's no change to that situation ... [and that] there are no hidden risks." See *id.* ¶ 83. In a March 5, 2002 press release, Messier stated that Media and Communications, operating free cash flow was "up 2 billion euros" and that defendants "stay fully committed to conveying full transparency in [their] financial results." *See id.* ¶ 89. In response to Moody's issuance of a debt rating one notch above "junk" status, Vivendi issued a press release to mitigate the impact of the rating by claiming that it "ha[d] no impact on Vivendi Universal's cash situation." *Id.* ¶ 100. As a consequence of the press release, plaintiffs assert that defendants were able to "limit the decline in the price of Vivendi's common stock and ADSs." *Id.* On May 28, 2002, Vivendi filed its Form 20–F signed by Hannezo for the 2001 fiscal year. In response to declines in common stock and ADS prices, defendants issued a press release in May 2002 stating that Vivendi "ha[d] no reason to anticipate or fear any further deterioration in its credit rating" and that the "cash situation ... [was] comfortable." *Id.* ¶ 103. By June 26, 2002, after a series of negative market rumors, Messier tried to reassure investors in a conference call by claiming that "there [was] no hidden liability." *Id.* ¶ 105. In addition on July 2, 2002, *Bloomberg* reported that Messier sent an e-mail to his employees reiterating that, despite Vivendi's debt being downgraded again and reports that Vivendi was in danger of default, "there [were] no hidden risks in the company's accounting." *Id.* ¶ 109. On July 3, 2002, Messier resigned and Vivendi, through new management, issued a press release acknowledging that it indeed had a short-term liquidity crisis. *Id.* ¶¶ 109–10. Later, the *Associated Press* reported on August 14, 2002 that Jean-Rene Fourtou ("Fourtou"), Vivendi's new

CEO, admitted that Vivendi " 'was [then] facing a liquidity problem.' " *Id.* ¶ 114.

In addition, plaintiffs allege that during the class period, Vivendi filed financial statements with the SEC that "were materially false and misleading because the financial statements materially inflated and distorted [Vivendi's] true financial performance during the [c]lass [p]eriod." *Id.* ¶ 122. More specifically, Vivendi allegedly failed to timely record goodwill impairments, *id.* ¶ 124, and Vivendi improperly applied generally accepted accounting principles ("GAAP") in regard to its acquisition of U.S. Filter, Seagram and Canal Plus. *Id.* ¶ 128.

In regard to Canal Plus, plaintiffs allege that Vivendi valued Canal Plus at Q12.5 billion, but reported Q12.6 billion as goodwill. *Id.* ¶ 129. By June 2002, under French GAAP, Vivendi had written off approximately 78% of that Q12.5 billion acquisition cost, but did not take any write-off for impaired goodwill under U.S. GAAP in 2000 or 2001. *Id.* ¶¶ 130–31. "[B]y refusing to take any goodwill impairment write-offs under U.S. GAAP [on its 2002 Form 20–F, Vivendi] effectively represented to investors that *the cash flows* Vivendi expected to receive from the assets it acquired prior to and during the [c]lass [p]eriod *equaled or exceeded* the carrying value of such assets," *id.* ¶ 132 (emphasis in original), though this allegedly was not in fact the situation, *see id.* ¶¶ 133–38 (referencing the complaint filed by Canal Plus in March 2002 alleging that NDS Group PLC's permitted the "proliferation of counterfeit smart cards that enabled users to circumvent the security measures built into the Canal [Plus's] conditional access system" and resulted in Canal Plus losing over a billion dollars). After Messier and Hannezo left Vivendi, Vivendi recorded an additional Q3.8 billion goodwill impairment for Canal Plus in the second quarter of

2002, even though Canal Plus reported revenue growth of 8%–providing "further evidence that the impairment recorded in [Canal Plus's goodwill] ... should have been taken earlier." *Id.* ¶ 141. In regard to the U.S. Filter acquisition, plaintiffs allege that Vivendi recorded approximately Q4.6 billion in goodwill when U.S. Filter's operating results were much less than reported by Vivendi. *See id.* ¶¶ 169–77. Because companies similar to U.S. Filter were sold during the class period for less than that paid by Vivendi, plaintiffs contend that defendants knew or recklessly ignored that U.S. Filter's reported goodwill was materially inflated, *id.* ¶¶ 146–47.

Plaintiffs also allege that defendants materially misrepresented Vivendi's financial statements by improperly consolidating the revenues from Cegetel and Maroc Telecom when it held less than a 50% ownership interest in those companies in 1999, 2000 and 2001. *See id.* ¶¶ 148–56. Specifically, plaintiffs allege that Vivendi's "consolidation of Cegetel's 1999–2001 operating results were false and misleading because Vivendi only owned 44% of Cegetel shares and it did not have a sufficient controlling financial interest in Cegetel." *Id.* ¶¶ 158–61. Consequently, "Vivendi's reported revenues were overstated by Q3.9 billion, Q5.1 billion and Q6.4 billion for the years ended 1999, 2000 and 2001, respectively." *Id.* ¶ 162. Similarly, plaintiffs allege that Vivendi's consolidation of Maroc Telecom's 2001 financial results in its 2001 Form 20–F was false and misleading because it only owned 35% of Maroc Telecom. Cegetel's and Maroc Telecom's improper consolidation is purportedly evidenced by Fourtou's statements during a June 26, 2002 conference call that Vivendi, at that time, did "not have access to [cash flow from] Cegetel and Maroc Telecom," and an August 14, 2002 conference call, during which Fourtou revealed that " 'Vivendi [could not] access the cash flow gen-

erated by the companies it owns less than 50 percent of.' " *Id.* ¶ 167. Vivendi's reported revenues were thus overstated by Q1.4 billion in 2001 for Maroc Telecom. *Id.* ¶ 168.

Vivendi's financial results were allegedly further distorted due to its purported improper recognition of revenue from its U.S. Filter subsidiary. *Id.* ¶¶ 169–72. In particular, "Vivendi ... [prematurely] recognized anticipated revenue from multi-year public service contracts upon signing on the contracts" in violation of GAAP and its own publicly disclosed revenue recognition policy. *Id.* ¶ 173; *see also id.* ¶¶ 174–80.

Plaintiffs additionally allege that Messier's stock buy-back program–where he clandestinely bought Vivendi stock on the market (approximately 10% of Vivendi's equity) in 2001–"caused [Vivendi] to spend approximately $6.3 *billion,*" *id.* ¶ 183(b) (emphasis in original), thus adding even greater burden to Vivendi's already massive debt. Defendants allegedly did not initially disclose this information and later made inadequate disclosures in regards to Vivendi's sale of put options in 2000 and 2001, which obligated Vivendi to purchase approximately 2% of all of its outstanding stock at an average price of Q69, when the actual share price should have been well below this. *Id.* ¶ 183(c). Plaintiffs cite numerous newspaper reports that examined the severity of Vivendi's liquidity crisis. *See id.* ¶¶ 184–88. Notably, an October 31, 2002 *Wall Street Journal* article reported that on December 13, 2001, Hannezo wrote to Messier stating: "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat.... All I ask is that all of this not end in shame." *Id.* ¶ 184. That article also reported that Messier touted the stability of Vivendi's debt-and-liquidity predicament despite be-

ing advised to the contrary by Vivendi's investment bank, Goldman Sachs & Co. ("Goldman Sachs"). *Id.* ¶ 186. At a French parliamentary hearing in September 2002, Fourtou admitted that had Messier remained CEO of Vivendi beyond July 3, 2003, Vivendi would invariably have gone bankrupt "within 10 days." *Id.* Moreover, on December 13, 2002, the *Associated Press* reported that "Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem." *Id.* ¶ 188.

## IV. DISCUSSION

### A. Subject Matter Jurisdiction Over Claims Brought by Foreign Plaintiffs

 Defendants assert that this Court lacks jurisdiction over the claims brought by foreign class members who acquired Vivendi ordinary shares traded on the foreign market. Under the "conduct test," which the Second Circuit has adopted to determine when extraterritorial application of the federal securities laws is warranted, this Court has subject matter jurisdiction over the claims of foreign investors abroad (1) "if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad." *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991). Defendants contend that the principal activities complained about by investors abroad were not directly caused by activities in the United States. *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (2d Cir.1995). More specifically, defendants note that Vivendi is a French corporation that is not registered to do business in the United States. Further, defendants note that Vivendi does not make quarterly filings as is required of American corporations by the SEC and

had only one corporate officer located in the United States until September 2001, when the individual defendants moved here. Thus, defendants claim that the alleged conduct at issue, namely the creation and dissemination of allegedly fraudulent statements and financial data, was initiated, organized and approved by Vivendi corporate executives in France. Further, defendants assert that Vivendi's filing of the Forms 20–F and 6–K with the SEC and other disseminated materials to shareholders in the United States cannot confer jurisdiction upon the claims of *foreign* purchasers, and that Vivendi's vast domestic presence by virtue of its numerous acquisitions in the United States is irrelevant to evaluating the subject matter jurisdiction over the claims of investors who bought their shares in foreign markets.

Plaintiffs have alleged that Vivendi undertook a scheme to acquire numerous well-known U.S. entertainment and publishing companies, such as Universal Studios, Houghton Mifflin and USA Networks, Compl. ¶ 23, and that to successfully accomplish this plan, it took on a $21 billion debt while fraudulently assuring all investors through false and misleading reports filed with the SEC and news releases that it had sufficient cashflow to manage its debts, *id.* ¶¶ 24, 54–192. Further, plaintiffs allege that two of the alleged principal actors in this scheme, Messier, Vivendi's former CEO, and Hannezo, Vivendi's former CFO, spent half of their time in the United States from September 2001 through the end of the relevant class period of August 31, 2002, specifically to increase investments by United States investors in Vivendi. *Id.* ¶¶ 69, 77, 90–92, 105. Contrary to defendants' characterization, their conduct can hardly be deemed merely preparatory within the United States. Given Messier's and Hannezo's

decision to move to the United States, allegedly to better direct corporate operations and more effectively promote misleading perceptions on Wall Street, which harbors some of the most watched securities exchanges in the world, one can reasonably infer that the alleged fraud on the American exchange was a "substantial' or 'significant contributing cause' of [foreign investor's] decision[s] to purchase [Vivendi's] stock" abroad. *Itoba Ltd.*, 54 F.3d at 122. *See, e.g.,* Compl. ¶¶ 21–25 (summarizing pervasiveness and coextensiveness of fraud in the United States and abroad to sustain Vivendi stock price and the use of instrumentalities of interstate commerce to promulgate the alleged fraud). Defendants' motion to dismiss claims brought by foreign plaintiffs for lack of subject matter jurisdiction is denied. *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 130–31 (2d Cir.1998) (finding "jurisdiction over a predominantly foreign securities transaction ... when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress."); *S.E.C. v. Princeton Economic Intern., Ltd.,* 84 F.Supp.2d 452, 454 (S.D.N.Y.2000) (assuming subject matter jurisdiction for conduct that was "more than merely preparatory" and was "a substantial or significant contributing cause to the losses"); *In re Gaming Lottery,* 58 F.Supp.2d 62, 73 (S.D.N.Y.1999) (same); *Leonard v. Garantia Banking Ltd.,* 1999 WL 944802, at *4–6 (S.D.N.Y. Oct. 19, 1999) ("[T]his Court finds that the trading of ADRs on the NYSE satisfies the conduct test, and any 'tipping of the scales' which might be required by [*Europe and Overseas Commodity Traders, S.A.*] is present in the use of United States banks and wire-transfer systems.").

## B. Compliance with Rule 8

■ Defendants contend that the complaint must be dismissed in its entirety under Rule 8 of the Federal Rules of Civil Procedure because it is an improper "puzzle pleading." In particular, defendants note that plaintiffs broadly allege that the Form F–4 that defendants filed with the SEC misstates the financial condition of Vivendi, but fails to specifically identify the pages containing the false statements in the 700–page document. Further, defendants note that plaintiffs have identified 38 separate statements that are said to be false, but do not identify with particularity what part of the document or quoted paragraph is false. Defendants contention, brought under Rule 8, in reality, seems to be nothing more than a claim under Rule 9(b). The degree of particularity that defendants seek–down to the precise sentence–simply is not mandated by the minimal pleading requirements of Rule 8. The complaint alleges that the Form F–4, signed by the individual defendants and filed by Vivendi, was misleading and improper because Vivendi presented false historical financial statements for fiscal year 1999 and the first half of fiscal year 2000. Compl. ¶ 54, 55. More specifically, the complaint alleges that Vivendi improperly consolidated into its financials, revenue from its Cegetel subsidiary, failed to timely write-down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter, and overstated the Company's revenue from its environmental division on certain multi-year contracts in violation of GAAP. *Id.* Further, plaintiffs pled facts in detail to support the reasons that the enumerated categories of statements are allegedly false and misleading. *See id.* ¶¶ 119–80. These

allegations suffice under the liberal pleading standard of Rule 8 to withstand a motion to dismiss.

## C. Exemption from § 14(a) of the 1934 Act

■ Section 14(a) prohibits any person from soliciting any shareholder proxy or consent or authorization in violation of SEC rules and regulations. 15 U.S.C. § 78n(a). Plaintiffs contend that the proxy statement included with the registration statement issued by Vivendi was materially false and misleading, and suggest that the falsity of the proxy statement should suffice to impose liability under § 14(a) of the 1934 Act. Rule 240.3a12–b(b), however, exempts "foreign private issuers" from liability under § 14(a). *Batchelder v. Kawamoto,* 147 F.3d 915, 923 (9th Cir.1998). Vivendi, undisputedly, is a corporation organized under French law, and it is therefore a "foreign issuer" under Rule 240.3b–4(b). 17 C.F.R. § 240.3b–4(b). Plaintiffs cite no authority or factual allegations that shows Vivendi fits within any exception to the definition of "foreign issuer." *See id.* § 240.3b–4(c). Further, plaintiffs fail to present any authority to support its position that liability may be imputed to Vivendi for Seagram's alleged misstatements in Seagram's proxy statements. Because Vivendi is a foreign private issuer, plaintiffs' § 14(a) claim against Vivendi must be dismissed.

## D. Section 11 and 12(a)(2) Claims Under the 1933 Act

■ Plaintiffs allege in counts I and II that Vivendi violated §§ 11 and 12(a)(2) of the 1933 Act when it submitted a registration statement and prospectus, filed on Form F–4 ("F–4"), dated October 30, 2000, in connection with the merger of Vivendi, Seagram and Canal Plus. Compl. ¶¶ 54–55, 198–215. To state a claim under § 11 of the 1933 Act, plaintiffs need only allege that a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k(a); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Section 12(a)(2) of the 1933 Act attaches liability to "[a]ny person who ... offers or sells a security ... by the use of any means or instruments ... in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). For the following three reasons, defendants' challenges to plaintiffs' claims on these counts must fail.

### 1. Named Plaintiffs Purportedly Lack Standing

Vivendi claims that none of the named plaintiffs received Vivendi shares pursuant to the allegedly fraudulent October 30, 2000 registration statement, *i.e.* Form F–4, but rather they obtained their shares pursuant to Form F–6, which plaintiffs do not allege to be false. According to plaintiffs, they purchased "Vivendi [American Depositary Shares] in exchange for Seagram stock as set forth in the [F–4] registration statement." Pl. Br. at 25–26. As background, an American Depository Share ("ADS") represents an ownership interest in a foreign deposited security, much like a share of stock represents an ownership interest in a corporation, that has been deposited with a depository, such as a United States bank or trust company. SEC, *American Depository Receipts,* 1991 WL 294145, at *2 (S.E.C. May 23, 1991). An American Depository Receipt ("ADR")

is a physical certificate, akin to a stock certificate, that evidences ownership in one or multiple fractions of an ADS. *Id.* Although the SEC formally differentiates between ADSs and ADRs, participants in the ADR market generally consider the terms to be synonymous, and use the terms interchangeably. *Id.; Definition* (visited 8/20/03) <http://www.adr.com/research/about _def.html>. For convenience, the term ADS will be used to refer to either ADSs or ADRs here. ADSs may be traded in the United States in much the same way as equity securities issued by domestic companies. *Id.* at *5. Under the 1933 Act, ADSs and the underlying foreign deposited securities are "considered separate securities, each subject to the registration requirements unless an exemption is available." *Id.* at *10. Thus, when a foreign issuer seeks to make a public offering in the United States of securities in the form of ADSs, both the ADSs and the foreign deposited securities generally must be registered. *Id.* "In 1983, the [SEC] adopted Form F–6 specifically for the registration of ADSs under the Securities Act." *Id.; see also* American Depository Receipts, 48 Fed.Reg. 12346–02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Form F–4 registers the foreign deposited securities. *See* 17 C.F.R. § 239.34; *see also American Depositary Receipts,* 1991 WL 294145, at *10 n. 47.

Here, Vivendi filed a Form F–4, in connection with the merger of Seagram, Vivendi, and Canal Plus into Vivendi Universal. The Form F–4 registered approximately 461 million ordinary shares, *i.e.,* foreign deposited securities, of Vivendi Universal, "represented by an equal number of Vivendi Universal ADSs." Pl. Exh. 2. Plaintiffs contend that Form F–6 "merely filed the Deposit Agreement with The Bank of New York, (which sets forth the terms by which the

ADS is represented by ordinary shares or may be exchanged for ordinary shares)," and that Vivendi's argument rests on the faulty premise that Form F–6 "registered" the ADSs that the plaintiffs acquired. I disagree. Plaintiffs cite no authority to support its position that a foreign issuer may register its ADSs with Form F–4, and indeed, such argument appears to run afoul of the SEC's rules, which specifically established the Form F–6 to register ADSs. *See* American Depository Receipts, 48 Fed.Reg. 12346–02 (1983) (codified at 17 C.F.R. pts. 200, 230, 239, 240, and 249); 17 C.F.R. § 239.36. Consistent with the SEC's rules, Form F–4 filed by Vivendi states that [t]his registration statement relates to the Vivendi Universal *ordinary shares* .... A separate registration statement on *Form F–6 will be filed in connection with the Vivendi Universal American Depository Shares.* Pl. Exh. 2 (emphasis added).

A claim under § 11 may be maintained only by those who specifically received their shares pursuant to the defective registration statement pleaded in the complaint. *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 786 (2d Cir.1951) (Section 11 claim "may be maintained only by one who comes within a narrow class of persons *i.e.* those who purchase securities that are the *direct* subject of the prospectus and registration statement.") (emphasis added); *Euro Trade & Forfaiting, Inc. v. Vowell,* 2002 WL 500672, at *11 (S.D.N.Y. Mar. 29, 2002); *see also Lee v. Ernst & Young, LLP,* 294 F.3d 969, 976–77 (8th Cir.2002) (holding that a cause of action exists under § 11 "so long as the security was indeed issued under *that* registration statement") (emphasis in original); *Joseph v. Q.T. Wiles,* 223 F.3d 1155, 1159 (10th Cir.2000) ("[t]he buyer must have purchased a security issued under the registration state-

ment at issue, rather than some other registration statement."). To the extent that plaintiffs bought Vivendi's ordinary shares pursuant to the allegedly defective Form F–4, *see* Compl. ¶¶ 1, 202, 213, 219, 222, they have standing to bring their § 11 and § 12(a)(2) claims. *See* 15 U.S.C. §§ 77k(a), 77l(a)(2). Further, plaintiffs who acquired their Vivendi ordinary shares after the merger between Vivendi, Seagram and Canal Plus may also have standing under § 11 provided the shares are traceable to the allegedly defective Form F–4. *See DeMaria v. Andersen,* 318 F.3d 170, 178 (2d Cir.2003). Because plaintiffs do not allege defects in the F–6 form, however, and thus, purchasers who bought ADSs pursuant to the F–6 form cannot claim to have standing under § 11 or § 12(a)(2) as to those shares, *id.,* their §§ 11 and 12(a)(2) claims based on the purchase of ADSs are barred.

**2. Pleading Under § 11 And § 12(a)(2) Are Too Vague To Be Cognizable**

■ Defendants contend that plaintiffs' allegations that Vivendi's financial statements and balance sheets in the F–4 were false and misleading are insufficient because they do not indicate what statements were false, why they were false or to what extent they were false. Defendants cite to a handful of cases that are inapposite because they all relate to the pleading requirement for violations of § 10(b) and Rule 10b–5 under the 1934 Act, which must satisfy the higher pleading standard of Rule 9(b) and the PSLRA. *See, e.g., Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982); *Weinstein v. Appelbaum,* 193 F.Supp.2d 774, 778–79 (S.D.N.Y.2002); *In re Health Mgm't Systems, Inc. Sec. Litig.,* 1998 WL 283286, at *2 (S.D.N.Y. June 1, 1998). The allegations deemed inadequate by defendants relate to the 1933 Act, which

courts have long held does not have a heightened pleading requirement. *See, e.g., In re IPO,* 241 F.Supp.2d 281, 337–42 (S.D.N.Y.2003); *In re In–Store Adver. Sec. Litig.,* 878 F.Supp. 645, 650 (S.D.N.Y. 1995); *Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y.1994); *In re College Bound Consol. Litig.,* 1994 WL 172408, at *3 (S.D.N.Y. May 4, 1994); *In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990, 1003 (S.D.N.Y.1992). Because a "suit under § 11 [and § 12(a)(2)] of the 1933 Act requires no proof of fraud or deceit," *Fischman v. Raytheon Mfg. Co.,* 188 F.2d at 786, the claims must merely meet the basic pleading standard in Rule 8(a). *In re IPO,* 241 F.Supp.2d at 338–39; *In re BankAmerica Corp. Sec. Litig.,* 78 F.Supp.2d 976, 987 (E.D.Mo.1999). The allegations that Vivendi improperly consolidated investments and reported inflated (and therefore misrepresented) revenues in the October 2000 registration statement and prospectus satisfy the requirements of Rule 8(a) to plead claims under §§ 11 and 12(a)(2). *See* Compl. ¶¶ 54, 148–180, 208–215.

**3. Defects In Form F–4 Fail To Support Claims Under §§ 11 Or 12(a)(2)**

**a. Plaintiffs' 1933 Act Claims Are Time Barred**

■ Defendants contend that plaintiffs' 1933 Act claims rest on an alleged "key clause" in the Cegetel shareholder agreement that was described in Vivendi's 2000 Form 20–F, filed July 2, 2001. In defendants' opinion, plaintiffs were on inquiry notice at least from July 2, 2001, and the one-year statute of limitations should start to run from that date. Plaintiffs, however, did not file their complaint until July 18, 2002. Further, defendants contend that

once plaintiffs were allegedly on inquiry notice that the Form 20–F contained one misstatement or omission, they should be considered on inquiry notice for all claims based on that prospectus, and that any such claim is now time-barred.

"[C]laims under Sections 11, 12, and 15 of the '33 Act are governed by the statute of limitations contained in Section 13 of the '33 Act." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 (2d Cir.1993) (citing 15 U.S.C. § 77m (1988)).[4] "Broadly speaking, the statutory periods for claims under either ... [the 1933 Act or the 1934 Act] begin to run when the claim accrued or upon discovery of the facts constituting the alleged fraud. Discovery, however, includes constructive and inquiry notice as well as actual notice." *Id.* at 350. The statute of limitations may be triggered "*when,* after obtaining inquiry notice ...., the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (emphasis in original). "To trigger the underlying duty to inquire ... defendant[s] must establish that plaintiff[s] acquired information that suggested the *probability* and not mere *possibility* that fraud had occurred." *Lenz v. Associated Inns and Restaurants Co. of America*, 833 F.Supp. 362, 371 (S.D.N.Y.1993) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (emphasis in original)).

The key clause that defendants reference, *see* Compl. ¶ 158, indicates that Vivendi's ability to access Cegetel assets could be blocked if three other minority shareholders dissented (BT, Mannesmann and Transtel). Although the key clause

indicates an exception to Vivendi's authority to acquire material amounts of Cegetel's assets, it reveals nothing about whether Vivendi lacked the authority to consolidate Cegetel's revenue. Rather, according to the Form 20–F, Vivendi held the right to consolidate Cegetel's revenues by virtue of a shareholder agreement, which gave Vivendi a majority of the shareholder voting rights. Compl. ¶¶ 157–159. Plaintiffs allege that it was not until a 2002 conference call with investors that Jean–Rene Fourtou finally revealed to the public that the agreement gave Vivendi only limited control over Cegetel, and thus Vivendi could not actually consolidate Cegetel's cash flow. *Id.* ¶ 160. Defendants cite to nothing else, other than the somewhat uninformative clause in the Form 20–F, that would suggest plaintiffs should have been on constructive or actual notice that Vivendi did not wield the authority to access Cegetel's revenue. I find inadequate basis to conclude at this time that plaintiffs were on inquiry notice of their §§ 11 or 12(a)(2) claims on and after July 2, 2001, the release date of the Form 20–F. Defendants' motion to dismiss plaintiffs' claims under § 11 and § 12(a)(2) as time-barred is denied.

**b. Vivendi's Lack of Actual Knowledge**

■ Vivendi notes that plaintiffs assert that the Form F–4 was false and misleading because Vivendi had "failed to timely write down impaired goodwill from previous corporate investments and acquisitions, including U.S. Filter." Vivendi Mem. at 10; Compl. ¶ 55. Vivendi contends that all of the facts relied upon by

---

4. Section 77m states in pertinent part:
 No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.
 15 U.S.C. § 77m (1988).

plaintiffs to establish this allegation post-date the Form F–4 filing, and thus, Vivendi argues that plaintiffs cannot establish that Vivendi *knew* it had overstated its reported goodwill in violation of § 11 and § 12(a)(2). Vivendi's argument is without merit.

Actual knowledge is not an element of either § 11 or § 12 claims. As explained by the United States Supreme Court:

> [Section] 11 of the 1933 Act unambiguously creates a private action for damages when a registration statement includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading. Within the limits specified by § 11(e) [, which do not apply here], the issuer of the securities is held **absolutely liable** for any damages resulting from such misstatement or omission.

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 207–08, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements."); *In re IPO*, 241 F.Supp.2d at 396. Similarly, "[w]ith respect to ... § 12(2) claim[s] [5]

... there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence." *Columbia Sav. and Loan Ass'n v. American Intern.*, 1994 WL 114828, at *4 (S.D.N.Y. Mar. 31, 1994) (quoting *Odette v. Shearson, Hammill & Co.*, 394 F.Supp. 946, 956 (S.D.N.Y.1975)). Despite Vivendi's purported lack of knowledge prior to preparing the Form F–4, it may nonetheless be held absolutely liable for damages resulting from the misstatements therein. The fact that plaintiff relies on evidence that post-date the Form F–4 does not vitiate the false or misleading nature of the registration statement. Defendants' motion to dismiss the § 11 and § 12(a)(2) claims, for failure to allege facts showing Vivendi knew of the allegedly false and misleading statements at or before the time they were made, is denied.

**E. Claims Under § 10(b) and Rule 10b–5**

In count V, plaintiffs allege that the earnings reported by Vivendi during the class period were false, in violation of § 10(b) and Rule 10b–5. To state a cause of action under § 10(b) [6] and Rule 10b–5,[7]

---

**5.** Section 12(a)(2) was known prior to the 1995 PSLRA amendments as Section 12(2). *In re WorldCom, Inc. Securities Litigation*, 294 F.Supp.2d 392, 408 (S.D.N.Y.2003).

**6.** Section 10(b) provides, in pertinent part, that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**7.** Rule 10b–5, the counterpart to § 10(b), describes what constitutes a manipulative or deceptive device and provides that it is unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

plaintiffs must allege that "defendant[s], in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff[s'] reliance on defendant[s'] action caused injury to the plaintiff[s]." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino*, 228 F.3d at 161). Section 10(b) claims sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001).

### 1. Timely Recordation Of Goodwill Impairment

■ Defendants contend that plaintiffs "have failed to plead any facts that would support an inference that Vivendi should have determined prior to January 2002" that a recorded impairment under Statements of Financial Accounting Standards ("SFAS") No. 121 should have been made. Vivendi Mem. at 13. According to Vivendi, impairment needs to be reported only when "the sum of the undiscounted future cash flows estimated to be generated from the use and ultimate disposal of the assets [is] less than the net carrying value of those assets." *Id.*

Plaintiffs contend that they have alleged numerous facts in the complaint to demonstrate that the cash flow from Canal Plus was impaired and should have been reported before the end of 2001. Namely, Canal Plus had filed a lawsuit in 1999 against another company for the piracy of its technology in the United States, allegedly giving rise to damages in excess of $1 billion. Compl. ¶¶ 134–36. In addition, Vivendi's new management, after Messier

and Hannezo resigned, recorded an additional Q3.8 billion impairment for Canal Plus, at the end of the first half of 2002, when under French GAAP, Canal Plus revenue grew by 8%. *Id.* ¶ 141. Plaintiffs allege that the additional impairments, in view of the revenue growth and lack of explanation from Vivendi for the added impairments, evidence the fact that Canal Plus's impairment should have been recorded earlier. *Id.* Furthermore, plaintiffs note that Vivendi prepared a memo shortly after it acquired Canal Plus, detailing that marketing rights to soccer contracts at Canal Plus were not bona fide assets, as originally believed, because they belonged to the football league, and thus they should be written off in Vivendi's year-end statement for the 2000 fiscal year. *Id.* ¶¶ 142–145. Vivendi failed, however, to write off that contract as a mistaken asset in its year-end financial statement. *Id.* ¶ 145. As to U.S. Filter, the complaint alleges that its reported goodwill was inflated, as evidenced by, among other things: (1) U.S. Filter's actual operating results were much less than reported because Vivendi improperly recognized revenue from U.S. Filter, contrary to U.S. GAAP rules, *id.* ¶¶ 146, 169–177, *see also infra* Part IV.E(3), and (2) companies comparable to U.S. Filter that sold during the class period held price-to-earning ratios that were much lower in comparison to the U.S. Filter shares purchased by Vivendi, *id.* ¶ 146. In addition, Vivendi's new management, after Messier and Hannezo resigned, reported an additional goodwill impairment of Q7.2 billion on a French GAAP basis for other entities. *Id.* ¶ 147. In contrast, in the prior quarter, while under former management, Vivendi re-

---

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5; *see also Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999).

ported no charge for goodwill impairment. Plaintiffs construe the sizable reported goodwill impairments in the subsequent quarter as an indication that the goodwill impairments recorded by the prior management during the class period was clearly insufficient. *Id.* I find that the facts alleged, which I must presume to be true, support a reasonable belief that the undiscounted future cash flows of Canal Plus, U.S. Filter and other entities, were less than the carrying value of those assets, *see, e.g.,* Compl. ¶¶ 134–36, 141, 145–47, 169–77, and hence their impairments of goodwill should have been reported, but were not. In view of the large impairments taken immediately after the departure of key figures in Vivendi's management, a reasonable inference can be drawn that Vivendi had reasonable grounds to believe the impairments had to be reported and that former management concluded not to do so. *See Novak,* 216 F.3d at 314 n. 1.

### 2. Improper Consolidation Of Maroc Telecom And Cegetel Revenues

■ Plaintiffs claim that Vivendi had improperly consolidated the financial revenues of Maroc Telecom and Cegetel into its own financial results, Compl. ¶¶ 148–168, and that Vivendi's reported revenues were overstated by an aggregate of Q3.9 billion, Q5.1 billion and Q7.8 billion for 1999, 2000 and 2001, respectively. *Id.* ¶¶ 162, 168. Vivendi contends that it controlled a majority of the shareholder voting rights in Cegetel and Maroc Telecom. Thus, according to Vivendi, it held "exclusive control" over Cegetel and Maroc Telecom under Article L.233–16 of the French Code de commerce, and it "was therefore required to consolidate pursuant to paragraph 1000 of the Appendix to Regulation 99–02 of the French Comité de la Réglementation Comptable ("CRC")." *See* Slifkin Decl. Exh. 8.

Although Vivendi may have had the ability to control a majority of the voting rights, the CEO of Vivendi, Jean–Rene Fourtou, admitted that it did not *own* a majority of the shares of either Cegetel or Maroc, and that it could not access the cash flow from those companies, despite the shareholder voting agreement. Compl. ¶¶ 160, 167. Paragraph 101 of the CRC provides that "[a] company under control or significant influence shall be *excluded from consolidation* if: ... severe and long-lasting restrictions substantially call into question ... the possibilities of transfers of financial resources between said company and the other companies included in the scope of consolidation." Slifkin Decl. Exh. 8 (emphasis added). In view of the exclusion provision of paragraph 101 under the CRC, I disagree with Vivendi that its inability to access the cash flow of Cegetel and Maroc Telecom is inconsequential when it comes to consolidated earnings. Contrary to Vivendi's claim, it would appear, given Fourtou's admission that certain restrictions prevented Vivendi from accessing Cegetel's and Maroc Telecom's cash flow, that under French GAAP, the restrictions arguably place the companies outside the scope of the mandatory consolidation.

Defendants further argue that reconciliation with U.S. GAAP requires that the parent company consolidate enterprises in which it has a controlling financial interest, as represented by a majority voting interest. Vivendi Mem. at 17 (citing SFAS No. 94 ¶ 13 (Slifkin Decl. Exh. 9)). Vivendi notes that the Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board ("FASB") also states that the minority shareholders' ability to block "dispositions of assets greater than 20% of the fair value of the investee's total assets" does not overcome the presumption of consolidation by the majority holder of the

shareholder voting interest. *See* Slifkin Decl. Exh. 10 at 4. Whether the rights of a minority shareholder may overcome the presumption of consolidation by the shareholder with a majority voting interest in a company is fact specific, *id.* at 3, and must be decided on a case-by-case basis from the totality of the circumstances. As further noted by the EITF, the rights granted the minority shareholders "may be so restrictive [on the majority shareholders] as to call into question whether control rests with the majority owner." *Id.* at 1. The facts and circumstances that may rebut the presumption of consolidation "should be based on whether the minority rights, individually or in the aggregate, provide for the minority shareholder to **effectively participate** in significant decisions that would be expected to be made in the 'ordinary course of business.'" *Id.* at 3 (emphasis added). If a minority shareholder holds "substantive participating rights," then the presumption that the majority shareholder should consolidate the investee's balance sheets is rebutted. *Id.* at 4.

In regards to earnings of a corporation jointly held by majority and minority shareholders, "[t]he rights of the minority shareholder relating to dividends or other distributions may be protective, or participating and should be assessed in light of the available facts and circumstances." *Id.* at 7, ¶ 3. A minority shareholder's right to block customary or expected dividends or other distributions may represent an example of the minority shareholder's substantive participating right. *Id.* Factors that should be weighed in this determination include: the relative ownership share of the minority shareholders, corporate governance arrangements, relationship between the majority and minority shareholders, and likelihood of the event or transaction that requires minority approval. *Id.* at 5–6.

Thus far, Vivendi has not publicly disclosed the terms of the shareholders agreement. As noted above, Fourtou admitted that during the class period, Vivendi did not have access to either Cegetel's or Maroc Telecom's cash flows. Compl. ¶¶ 160, 167. Given the limited information available at this pre-discovery stage, and the fact-intensive inquiry required to resolve whether the minority interests in Cegetel and Maroc Telecom constitutes sufficient "substantive participating rights" to make consolidation improper under SFAS 94 and EITF 96–16, I am unconvinced that facts could not be proven to demonstrate that Vivendi's consolidation of those companies' revenues were improper under U.S. GAAP, which may give rise to liability under § 10(b) and Rule 10b–5.[8]

---

**8.** Citing *Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir.1996), Vivendi contends that even if it did not comply with U.S. GAAP, this in and of itself is not sufficient to create § 10(b) liability. Vivendi is mistaken. "[A]llegations of GAAP violations or accounting irregularities ... [when] coupled with evidence of 'corresponding fraudulent intent' ... [are] sufficient." *Novak,* 216 F.3d at 309 (quoting *Chill,* 101 F.3d at 270); *see also Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120–21 (2d Cir.1982); 17 C.F.R. § 210.4–01(a)(1)("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided."). Here, "[p]laintiffs have adequately alleged that ... [d]efendants either had actual knowledge of or ready access to facts that contradicted their ... statements" *In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 631 (S.D.N.Y.2003); *see* Compl. ¶¶ 134–38, 142–45, 157–68. Furthermore, plaintiffs have sufficiently alleged facts from which one may reasonably infer that defendants knew or should have known of the accounting impropriety. *See* Compl. ¶¶ 134–36, 141, 145–47, 169–77; *see also infra* Part IV.E(6).

Drawing all reasonable inferences in favor of plaintiffs, the complaint alleges sufficient facts to show that Vivendi overstated its revenues, in reliance on revenue streams from companies that it had no right to tap.

■ Lastly, defendants claim that even if consolidation of the subsidiaries were improper, it had no material effect on Vivendi's net income and shareholder equity. Defendants ignore the fact that the reported *Q17 billion* in additional revenue impacted other material financial metrics that investors commonly rely on, such as revenue growth and EBITDA. These metrics demonstrate that the overstated revenue may constitute a misrepresented material fact that can support claims under § 10(b) and Rule 10b–5. Accordingly, Vivendi's motion to dismiss these claims, on the basis that it properly consolidated Cegetel's and Maroc Telecom's revenue or that there have been no misrepresentations of material fact, is denied.

### 3. Improper Recognition Of Revenue From U.S. Filter

■ Vivendi argues that plaintiffs do not plead sufficient facts to demonstrate the impropriety in its recognition of revenue from U.S. Filter.[9] Accordingly, Vivendi contends that plaintiffs cannot rely upon the revenues recognized by Vivendi from U.S. Filter to demonstrate the falsity of Vivendi's financial statements during the class period. Vivendi contends that such allegations are based on plaintiffs' misunderstanding of "booking to backlog"–a practice that Vivendi asserts is an accepted practice of managerial record-keeping.[10]

Vivendi further asserts that plaintiffs' allegation that the reported revenue from Vivendi's Environmental Services division was overstated "by as much as 10 times" due to U.S. Filter's improper accounting is mathematically impossible.

Plaintiffs contend that Vivendi violated U.S. GAAP because it "recognized and reported the entire dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract," resulting "in improperly recognized anticipated revenue from multi-year public service contracts" and yielding materially overstated operating results during the class period. Compl. ¶ 173–174. Although defendants disagree with plaintiffs' characterization, defendants do not dispute this description of how Vivendi recognized revenue from U.S. Filter. Moreover, plaintiffs contend, and defendants do not dispute, that "U.S. GAAP provides that revenue *should not be recognized* until it is realized or realizable and earned." Compl. ¶ 170 (citing FASB Concepts Statement No. 5, ¶ 83) (emphasis added). In addition, the SEC, FASB, and other accounting advisory sources advise that until services have been rendered, revenues for those services should not be recognized. *Id.* (citing SEC Staff Accounting Bulletin ("SAB") No. 101 (The SEC staff "believes that up-front fees, even if non-refundable, are earned as the products and/or services are delivered and /or performed over the term of the arrangement or the expected period of performance.")); FASB Concept Statement Nos. 2 and 5; Accounting Research Bulletin No. 43, Accounting Principles Board Opinion No. 10. The opinions expressed by the various accounting sources

---

**9.** U.S. Filter is a subsidiary of Vivendi Environmental, which in turn, was a subsidiary of Vivendi during the class period.

**10.** "Backlog" is the "value of unfilled orders placed with a manufacturing company.

Whether the firm's backlog is rising or falling is a clue to its future sales and earnings." *Barron's Dictionary of Finance and Investment Terms* 37 (4th ed.1995).

incorporated by reference in the complaint suffice to show that the revenues from U.S. Filter were recognized prematurely. Accordingly, I agree that plaintiffs have pled enough to provide a reasonable basis to infer that Vivendi indeed materially overstated its revenue, in part, through improperly recognizing revenue from U.S. Filter.[11]

### 4. "Growing liquidity crisis"

 Vivendi contends that plaintiffs do not allege sufficient facts to show that it failed to disclose adequate evidence of its "growing liquidity crisis." Vivendi asserts that it timely disclosed (1) its impairments to goodwill relating to its prior acquisitions and in accordance with French and U.S. GAAP; (2) its stock repurchase program in 2001 pursuant to French regulations; and (3) the put options sold in 2000 and 2001. Accordingly, Vivendi argues plaintiffs were aware or should have been aware of the purported liquidity crisis. Further, Vivendi asserts that plaintiffs' allegations are insufficient to show that Vivendi was aware of the problem at the times it attested to its alleged financial health.

I find the complaint adequately alleges facts from which I may infer that Vivendi had a liquidity problem, of which it was aware during the class period. For instance, the complaint notes that in December 6, 2001, Messier assured investors that "Vivendi Universal is in a very strong posi-tion, with solid performance in virtually every business." Compl. ¶ 8. According to the complaint, Messier further announced that with the sales of Vivendi's $1.5 billion interest in British Sky Broadcasting Plc and $1.06 billion interest in Vivendi Environnement, Vivendi would have "room to maneuver" for additional acquisitions. *Id.* Contrary to the rosy picture painted by Messier, Hannezo, a long time friend of Messier and Vivendi's CFO, allegedly sent a desperate handwritten plea to Messier a week later, stating: "I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat.... All I ask is that all of this not end in shame." *Id.* ¶¶ 9, 184. According to an investigative report by the Wall Street Journal, entitled, "How Messier Kept Cash Crises at Vivendi Hidden; Media Giant Was At Risk Well Before Investors Knew," Vivendi, unbeknownst to investors and Vivendi's board, had "narrowly averted" a downgrade by credit-rating agencies in December 2001, which would have made it difficult to borrow money and would have "plunged the company into a cash crisis." *Id.* In the wake of the narrowly averted downgrade, Hannezo sent his handwritten plea to Messier the same day and "implored [Messier] to take serious steps to reduce Vivendi's ballooning debt." *Id.* The following day, Messier, according to two directors who attended the board meeting, "made no mention of the close call with the

---

11. Plaintiffs allege that Vivendi Environmental's revenue was overstated by "as much as ten times" as a result of improper revenue recognition from its subsidiary, U.S. Filter. Defendants note for that allegation to be true, U.S. Filter's revenue would have to amount to about Q23.8 billion. U.S. Filter, however, earned only a reported Q1.32 billion in 2000. Plaintiffs concede that this was a misstatement on their part and represent that they meant to say that revenue from U.S. Filter, rather than Vivendi Environment, was overstated by as much as ten times. It appears that plaintiffs' misstatement was a consequence of clerical error. Even if I disregarded plaintiffs' allegations concerning the magnitude of the overstatement, enough factual allegations have been pled to convince me that U.S. Filter's revenue may have been improperly recognized, resulting in inflated reported earnings by Vivendi. I will grant plaintiffs leave to amend their allegation in paragraph 174 of their complaint.

rating agencies," and reported that the "company had no problem." *Id.* Accordingly, the board approved the $10 billion acquisition of USA Networks, unaware that "Vivendi was already in dire financial straits." *Id.*

The complaint further alleges that in the first half of 2002, defendants continued to deny that Vivendi had any liquidity problems. *See id.* ¶ 83 (assuring employees of Vivendi that "[t]here are no hidden risks" to warrant issue of a profit warning); ¶ 103 (stating that "the Company has *no reason* to anticipate or fear any further deterioration in its credit rating"); ¶ 106 (reporting to investors in June 2002 that "the company has no hidden, off-balance sheet liabilities," and adding "We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months."). On June 24, 2002, Goldman Sachs issued a report to Vivendi's top executives and a handful of directors that indicated Vivendi could face bankruptcy as early as September or October of that year. *Id.* ¶ 186. Reportedly, a director who attended the meeting with Goldman Sachs advised Messier that he should resign, "as it was now clear Vivendi faced a severe cash crisis." *Id.* In contrast to the grim prediction by Goldman Sachs, Messier reported to the Commission des Operations de Bourse ("COB") two days later, on June 26, 2002, that "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months." *Id.* Contrary to Messier's representation to the public and public agencies, Jean–Rene Fourtou, Vivendi's new CEO after Messier resigned in July 2002, stated that when he took over, "if Mr. Messier had stayed, the company would have gone bankrupt within 10 days." *Id.* The December 2001 handwritten note, the report from Goldman Sachs and investigative reports from other news sources, provide sufficient basis to support a rea-sonable belief that Vivendi had an existing liquidity problem, of which defendants were aware, during 2001 and 2002.

Defendants complaint that the numerous news articles reported after the end of the class period cannot establish the fact that Vivendi was aware of its liquidity problems at the time it made the statements at issue, and that plaintiffs seek to prove fraud by hindsight. The Second Circuit has explicitly recognized that plaintiffs may "rel[y] on post-class period data to confirm what a defendant should have known during the class period." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 72 (citing *Rothman,* 220 F.3d at 92; *Novak,* 216 F.3d at 312–13). Defendants provide nothing to impugn the veracity of these post-dated news articles. To accept defendants' reasoning, I should reward them for their successful concealment of their wrongdoing, which for the most part did not come to light until those in control of Vivendi resigned and lost the ability to further conceal the true extent of Vivendi's financial woes. I decline to adopt defendants' reasoning. Defendants further complaint that they disclosed sufficient information to allow investors to understand the extent of Vivendi's liquidity problems and true financial condition. Vivendi's purported "truth on the market" defense is "intensely fact-specific" and "rarely an appropriate basis for [dismissal]." *Gamino v. Citizens Utilities Co.,* 228 F.3d 154, 167 (2d Cir.2000). The "truth on the market" defense requires defendants to show that the "corrective information [was] conveyed to the public 'with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information created by' the alleged misstatements." *Id.* (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1116 (9th Cir.1989)). Defendants certainly cannot meet that burden at this stage of the liti-

gation. *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482–83 (S.D.N.Y.1994) ("defendants' burden [of establishing the truth on the market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage."). Moreover, defendants' claim that the market knew or should have known of Vivendi's liquidity crisis is belied by the precipitous drop in debt ratings and securities prices that followed immediately after Messier and Hannezo stepped down, and information of Vivendi's actual financial condition started to emerge. *See id.* ¶¶ 109, 115, 184. Indeed, as discussed above, plaintiffs have pled sufficient facts to show that Vivendi appears to have not fully disclosed impairments to goodwill in accordance with U.S. and French GAAP and moreover, reported inflated cash flow by improperly recognizing revenues from Cegetel, Maroc Telecom, and U.S. Filter. Plaintiffs have alleged sufficient facts, as reviewed above in brief, to provide a reasonable belief that defendants knew that its statements regarding Vivendi's financial health and liquidity were false, and that Vivendi did indeed have a liquidity problem.

### 5. False and Misleading Nature of Vivendi's Other Public Statements

#### a. Inactionable puffery

▇ Vivendi argues that many of the statements alleged to be false either are so vague that they could not mislead a reasonable investor or are merely opinions and, hence, "soft information," which are inactionable as a matter of law. *See* Compl. ¶¶ 57–62, 67–69, 73–75, 79–81, 83, 85, 87–90, 94–96, 100, 103–106. Contrary to defendants' beliefs, they cannot escape liability merely because the opinions "on which liability [is] predicated did not express a reason in dollars and cents, but focused instead on ... 'indefinite and unverifiable' term[s]." *Virginia Bankshares,*

*Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). "The objection ignores the fact that such conclusory terms in a commercial context [may be] reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* Indeed, "[s]tatements regarding projections of future performance may be actionable ... if they are worded as guarantees or are supported by specific statements of fact, ... *or* if the speaker does not genuinely or reasonably believe them" at the time they were made. *In re IBM,* 163 F.3d at 107 (emphasis added); *Faulkner v. Verizon Communications, Inc.,* 156 F.Supp.2d 384, 398 (S.D.N.Y. 2001); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Moreover, "defendants may be liable for misrepresentations of existing facts" if they knew of the falsity of such statements at the time of making them. *Novak,* 216 F.3d at 315. Whether the opinion or "soft information" is indeed actionable "depends on all relevant circumstances of the particular case," *Ganino,* 228 F.3d at 162, and is generally not an appropriate basis on which to dismiss a complaint at this stage of the action. In view of allegations that defendants, such as Messier, continued to represent to the public that Vivendi was financially solid, despite being aware of the financial precipice on which it stood when its debt rating was almost downgraded, Compl. ¶ 184, and the possibility that it would need to declare bankruptcy soon, *id.* ¶ 186, plaintiffs have alleged sufficient facts to show defendants could not have reasonably believed the statements made to the public. Plaintiffs have plead sufficient facts to show, at this stage, that defendants' statements, which defendants characterize as puffery, are indeed actionable.

### b. Forward-looking statements.

■■■ Vivendi contends that many of the alleged statements are forward-looking, and thus, they are inactionable, pursuant to the PSLRA "safe harbor" provision. The PSLRA safe harbor provision has two prongs.

The first prong provides in relevant part that a securities fraud defendant: "shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."

*Fellman v. Electro Optical Sys. Corp.,* 2000 WL 489713, at *4 (S.D.N.Y. April 25, 2000) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). By definition, the safe-harbor provision applies to protect only "forward-looking" statements, and not to misrepresentations of historical or current facts. *In re Oxford,* 187 F.R.D. at 141; *In re Complete Mgmt. Sec. Litig.,* 153 F.Supp.2d 314, 340 (S.D.N.Y.2001). "[L]inking future success to present and past performance does not render statements immune from liability." *In re APAC Teleservice, Inc.,* 1999 WL 1052004, at *8.

Vivendi contends that paragraphs 58, 61, 80, 85, 88, 89, 94, 95, 100, 103, and 104 in the complaint, for instance, may not serve as an actionable basis for liability under the PSLRA because (1) the paragraphs cite to forward-looking statements, and (2) the paragraphs cite to language that is accompanied by meaningful cautionary statements. The paragraphs cited include Vivendi's announcements of allegedly false financial results from prior quarters or purported opinion as to its cash situation, which are not subject to the safe harbor provision. Although the announcements often further include forward-looking statements and a generic warning that "actual results may differ," the "safe harbor provision ... requires that defendants identify 'important factors that could cause actual results to differ materially from those in the forward-looking statements.'" *Helwig v. Vencor, Inc.,* 251 F.3d 540, 558 (6th Cir.2001) (citing 15 U.S.C. § 78u–5(c)(1)(A)(i)). "[T]he legislative history makes clear that [such] 'boilerplate warnings will not suffice....The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Id.* 558–59 (quoting H.R. Conf. Rep. No. 104–369, at 43 (1995), U.S.Code Cong. & Admin. News at 742). The generic warning that "actual results may differ," which Vivendi included with its announcement, does not come close to the "cautionary language [needed] to render reliance on the misrepresentation unreasonable." *Steinberg v. PRT Group, Inc.,* 88 F.Supp.2d 294, 301 (S.D.N.Y.2000). Thus, to the extent the announcements contain forward-looking statements, the cautionary statements do not suffice to place them within the ambit of the safe-harbor provision in the PSLRA.

### c. Statements From Defendants Published By Reporters And An Analyst

■■■ Vivendi contends that plaintiffs have failed to plead the necessary facts that would allow them to hold defendants liable for statements reported by six reporters and one analyst. *See* Compl. ¶¶ 59, 79, 83, 87, 106, 109. The challenged paragraphs, in actuality, report *direct quotes* and statements made by Messier. Defendants provide no reason why I

should believe that the reported quotes and statements were wrongly attributed. It defies common sense to argue that defendants may not be held accountable for their quotes and statements, solely because they were published by a third party. I agree that defendants may be held liable for the statements made to and subsequently published by reporters and analysts that are pled in the complaint.

### d. Failure to plead with particularity under Rule 9(b) and PSLRA

▮ Defendants contend that plaintiffs' § 10(b) allegations were not pled with sufficient particularity under Rule 9(b) and the PSLRA. Rule 9(b) requires that "the circumstances constituting ... fraud be stated with particularity." Fed.R.Civ.P. 9(b). The particularity requirement of the PSLRA is largely the same as Rule 9(b), except when "plaintiffs allege, on information and belief, that defendants made material misstatements or omissions," in which case, "the complaint must 'state with particularity all facts on which that belief is formed.'" *Novak*, 216 F.3d at 312; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999) (noting that § 78u–4(b)(1) "echoes precisely Fed. R.Civ.P. 9(b)"). Here, to satisfy Rule 9(b) and § 78u–4(b)(1) of the PSLRA, plaintiffs must "specify the statements that ... were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *Novak*, 216 F.3d at 306. Section 78u–4(b)(1) requires that "the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n. 1; *see also See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 (even under Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation.").

Defendants, for the most part, do not dispute that plaintiffs adequately allege what statements were fraudulent, who made the statements, and the circumstances under which the statements were made. Vivendi Mem. at 25. Rather, defendants attack principally the adequacy of plaintiffs' explanation in their pleading of how defendants' statements were false and misleading. *Id.* Contrary to defendants' argument, I find, as discussed above at length, that plaintiffs adequately allege how defendants' improper accounting practices translated into false and misleading financial statements. *See supra*, Part IV. E(1)-(4). Section 78u–4(b)(2) of the PSLRA further requires that plaintiffs plead with particularity facts giving rise to a "strong inference" that defendants acted with scienter. As discussed below, defendants' argument that scienter has not been adequately pled is also without merit.

### 6. Scienter

▮ To adequately plead scienter, plaintiffs must allege facts to support a strong inference of "an intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375; *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001); 15 U.S.C. § 78u–4(b)(2). "Such intent can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168–69 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)).

### a. "Motive and Opportunity"

▮ Vivendi contends that plaintiffs' allegations of motive based on (1) the desire to maintain positive credit ratings, (2) the desire to inflate share prices in order to acquire other companies, (3) the use of put options sold to banks, and (4) executive

compensation are all inadequate.[12] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit*, 264 F.3d at 139 (internal quotations and citations omitted). Here, plaintiffs allege that defendants were motivated to commit fraud so they could acquire and continue acquiring companies, including USA Networks, MP3.com and Multithematicques, by using its artificially inflated stock and ADSs as currency. Comp. ¶ 191. Scienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices. *See, e.g., Rothman*, 220 F.3d at 93–94; *Burstyn v. Worldwide Xceed Group, Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002). Furthermore, Messier was given a "concrete and personal benefit" in the form of a bonus worth more than $3 million, amounting to two and half times his normal salary, for boosting Vivendi's EBITDA by more than 30% in 2001. *Id.* ¶ 193. He therefore had an even greater motive for inflating the appearance of Vivendi's financial performance, from which he derived a specific "concrete benefit by virtue of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). Accordingly, such allegations support a basis sufficient to infer Vivendi, Messier, and Hannezo had one or more motives to promulgate the alleged falsehoods in regard to Vivendi's financial state.

### b. "Conscious misbehavior and recklessness."

Alternatively, Vivendi contends that plaintiffs failed to allege with the requisite particularity facts that evidence defendants' knowledge or recklessness as to the purported fraudulent statements, including (1) the alleged Canal Plus overstatement, (2) the alleged improper inflation of U.S. Filter goodwill, (3) the alleged improper consolidation of revenue from Cegetel and Maroc Telecom, and (4) the alleged liquidity crisis.

Pleading "conscious misbehavior or recklessness" requires plaintiffs to provide factual allegations that support a strong inference that defendants knew, or had a reasonable basis to know, or recklessly disregarded, that the allegedly fraudulent statements were untrue when made. *See Novak*, 216 F.3d at 311; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Here, plaintiffs allege that Vivendi narrowly averted a downgrade of its credit in December 2001, which would have plunged it into a cash crisis and made it difficult to borrow additional money for further acquisitions. Compl. ¶ 184. In the wake of the narrowly averted downgrade, Hannezo allegedly sent the now famous or infamous handwritten plea to Messier. *Id.* ¶¶ 9, 184. Messier's fraudulent intent or reckless disregard may be inferred from his alleged failure to mention the narrowly averted disaster when he was urging the board of directors to approve the $10 billion acquisition of USA Network's TV and film business two days later. *Id.* In addition to concealing the narrowly averted downgrade, Messier purportedly attempted to conceal from investors, the board, and even Hannezo, his $6.3 billion stock buy-back to bolster Vivendi's share price. As for Hannezo, he knew, for instance, from a January 29, 2001 memo, which was prepared shortly after Vivendi acquired Canal Plus, that the football marketing

---

12. Vivendi does not dispute opportunity.

rights, originally believed to be an asset of Canal Plus, belonged in fact to the football league. *Id.* ¶ 143. Plaintiffs allege that Hannezo knew or should have known, but recklessly disregarded, the fact that Vivendi took no impairment charge in fiscal year 2001, resulting in Vivendi overstating the value of its subsidiary. *Id.* ¶¶ 133, 139, 144–45. Additionally, Hannezo allegedly became aware that the stock buy back program, which Messier instigated, was a "waste of cash" and that it had taken such a toll on Vivendi's cash flow that "Vivendi was running out of cash," according to a memo prepared by Hannezo. *Id.* ¶ 184(b). In the face of these problems, Hannezo, as Vivendi's CFO, continued to prepare and sign financial statements, which overstated Vivendi's financials, Compl. ¶¶ 54, 62, 66, 102, and advanced the fraud on the plaintiffs by remaining silent about the fraudulent nature of the statements and press releases issued by Vivendi or his "close collaborator," Messier. Drawing all inferences in favor of plaintiffs, these allegations suffice to establish strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation ... [or] failed to review or check information that they had a duty to monitor." *Novak,* 216 F.3d at 308.

### F. Claim Under § 12(a)(2) Against Messier And Hannezo

 Messier contends plaintiffs have not adequately pled facts to show that he is a statutory "seller" under § 12(a)(2) of the 1933 Act. More specifically, Messier contends that plaintiffs' claim must fail because they have not pled that he "personally" solicited the securities purchased by plaintiffs, as allegedly required by the United States Supreme Court in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The *Pinter* Court

defined a "seller" for purposes of § 12(a)(1) to be the person who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain. *Id.* at 642, 647, 108 S.Ct. 2063. The Second Circuit extended *Pinter's* definition of "seller" to claims arising under § 12(a)(2) of the Securities Act. *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988). Since *Capri,* it has become well settled in this Circuit that the seller need not have "personal" contact with the purchaser, contrary to Messier's argument, to be held liable under § 12(a)(2). *See Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989) (holding that "[p]ersons who are not in privity with the plaintiff ... [are] statutory sellers within the meaning of *Pinter* if **they solicited the sales in question for a financial gain**") (emphasis added); *Dorchester Investors v. Peak Trends Trust,* 2003 WL 223466, at *2 (S.D.N.Y. Feb.3, 2003); *In re OPUS360 Corp. Sec. Litig.,* 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,* 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001); *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 761–62 (S.D.N.Y.2001); *Griffin v. PaineWebber, Inc.,* 2001 WL 740764, at *3 (S.D.N.Y. June 29, 2001); *In re APAC Teleservice, Inc. Sec. Litig.,* 1999 WL 1052004, at *11 (S.D.N.Y. Nov. 19, 1999); *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1315 (S.D.N.Y.1996).

Against the prevailing weight of authority, Messier relies upon *In re Gas Reclamation, Inc. Sec. Litig.,* 733 F.Supp. 713, 724 (S.D.N.Y.1990), to show that plaintiffs' claim must still be dismissed. *Gas Reclamation,* however, is inapposite to the case-at-bar. Unlike here, the defendant's efforts in *Gas Reclamation* were largely collateral, assisting those more directly involved with solicitation. *Id.* at 723; *see*

also *Pinter*, 486 U.S. at 650 n. 26, 108 S.Ct. 2063 (rejecting liability to collateral participants). Given the scarcity of evidence in regard to defendant's direct solicitation activities, the court in *Gas Reclamation* determined that no reasonable juror could find for plaintiffs on their § 12(a)(2) claim, and granted the defendant summary judgment on that claim. *Id.* at 724.

Here, plaintiffs do not simply plead that Messier signed the registration statement, which in itself is particularly "significant for purposes of finding that a [person] is a seller," *In re OPUS360*, 2002 WL 31190157, at *10; *see also Degulis*, 928 F.Supp. at 1315. ("signing the registration statement ... [is] a sufficient allegation to permit Plaintiffs to [withstand a motion to dismiss]")(citing *Capri v. Murphy*, 856 F.2d at 478), but they further plead a number of other facts to show the steps taken personally by Messier to solicit the purchase of Vivendi securities and to increase the share price of those securities. Namely, the complaint alleges that Messier actively participated in the preparation of the allegedly misleading or false registration statement, Compl. ¶ 38, and regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities, Compl. ¶¶ 58, 59, 62, 68, 87, 89, 90, 107. Furthermore, Messier stood to financially benefit from the increased sale and share price of Vivendi's securities. *See id.* ¶ 193 (alleging Messier received a $3 million bonus, or two and a half times his salary, for boosting Vivendi's EBITDA by 30%, and that he would have received triple his salary if he boosted the EBITDA by 35%). These allegations suffice to show that Messier was a "seller" under § 12(a)(2) and to withstand a motion to dismiss here. *See In re OPUS360 Corp. Sec. Litig.*, 2002 WL 31190157, at *10; *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d

at 761–62; *Griffin*, 2001 WL 740764, at *3; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 439 (S.D.N.Y.2000), *Milman v. Box Hill Sys.*, 72 F.Supp.2d 220, 230 (S.D.N.Y.1999).

Hannezo seeks to rely on the same argument as Messier to show that he is not a statutory seller within the meaning of § 12(a)(2). Like Messier, Hannezo signed the alleged false and misleading registration statement, *id* ¶ 54, and allegedly was a close collaborator of Messier's, *id.* ¶ 33. Although these allegations help establish that Hannezo acted with Messier to solicit the securities purchased by plaintiffs, I do not find facts alleged to show how Hannezo stood to financially gain from his actions. Accordingly, the § 12(a)(2) claim against Hannezo is dismissed.

## G. Claims Under § 15 of 1933 Act Against Messier & Hannezo

### 1. Legal Standard To Plead A Section 15 Claim

"In order to establish a *prima facie* Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))." *In re IPO*, 241 F.Supp.2d at 352. The heightened pleading standard under Rule 9(b) or the PSLRA does not apply because fraud and scienter are not necessary elements of the claim. *Id.* Thus, section 15 claims need only satisfy the minimal pleading standards of Rule 8. *Id.* While actual control and not just control status is needed to hold a person liable under § 15, "naked allegations of control ... will typically suffice" to plead an adequate § 15 claim to withstand a motion to dismiss under Rule 8. *In re IPO*, 241 F.Supp.2d at 352; *see also In re Sterling Foster & Co. Sec. Litig.*, 222 F.Supp.2d 216, 282–83 (E.D.N.Y.2002). "Because the

underlying violation pursuant to section 15 is a violation of sections 11 and 12(a)(2) in which strict liability is imposed (*i.e.,* knowledge of the misrepresentation is not required), this Court agrees with those district courts that have held that [culpable participation is not an element] required to establish a *prima facie* case of control person liability pursuant to section 15." *In re Deutsche Telekom AG Sec. Litig.,* 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002); *see also Dorchester Investors,* 2003 WL 223466, at *3; *In re Indep. Energy Holdings PLC,* 154 F.Supp.2d at 770; *Griffin,* 2001 WL 740764, at *3; *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, at *4 (S.D.N.Y. April 19, 2001); *In re APAC Teleservice, Inc. Sec. Litig.,* 1999 WL 1052004, at *11; *Degulis,* 928 F.Supp. at 1315. Although a handful of cases hold to the contrary, *Wallace v. Buttar,* 2003 WL 103019, at *8 n. 1 (S.D.N.Y. Jan.14, 2003); *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 441 (S.D.N.Y.2001); *DeMaria v. Andersen,* 153 F.Supp.2d 300, 314 (S.D.N.Y.2001); *aff'd on other grounds* 318 F.3d 170 (2d Cir.2003), *Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999), I concur with Judge Stein's reasoning in *Deutsche Telekom* and the apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15.[13]

## 2. Section 15 Claim Against Messier and Hannezo

██ Messier contends that the plaintiffs have not adequately pled facts to show that he had **actual control** over Vivendi–the primary violator–or that he was a culpable participant. As discussed above, plaintiffs do not have to plead culpable participation to sustain their § 15 claim against a motion to dismiss. Messier further argues that merely asserting the power to control by virtue of his status as CEO and chairman of the board for Vivendi is insufficient to plead actual control, as allegedly required by the Second Circuit in *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). *First Jersey* was concerned with the sufficiency of evidence as to control at the conclusion of trial and its holding is inapposite to the situation here, on a motion to dismiss. In any event, *First Jersey* is instructive on what "control" means—it is defined as " 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contact, or otherwise' " *First Jersey,* 101 F.3d at 1472 (quoting 17 C.F.R. 240.12b–2). Messier's status as Vivendi's CEO, coupled with his "direct and/or indirect business and/or personal relationships with other directors and/or major shareholders," Compl. ¶ 218, apparent ability to conceal or deflect worries about Vivendi's financial condition until he left while commencing new deals to acquire more assets, *id.* ¶¶ 14, 15, 23, 49–52, 73, 83, 100, 184, and ability to orchestrate, without the full knowledge of the board, a $6.3 billion stock buy-back by Vivendi to help prop up its stock price, *id.* ¶ 183(b), provide sufficient underpinnings from which it may be reasonably inferred that he "had the power to control or influence, directly or indirectly, the corporation or its management." *Jacobs v. Coopers & Lybrand, LLP,* 1999 WL 101772, at *17 (S.D.N.Y. Mar.1, 1999); *see In re IPO,* 241 F.Supp.2d at 352 n. 85 (concluding "by virtue of their positions (*e.g.,* CEO, CFO) and Plaintiffs' specific allegations, . . . [the defendants] very likely exercised . . . control"); *In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 770

---

**13.** The Second Circuit, as far as I am aware, has yet to render a decision on this issue.

(S.D.N.Y.2001); *Gabriel Capital, L.P.*, 122 F.Supp.2d at 426–27. Having found sufficient facts pled to show that Vivendi violated §§ 11 and 12(a)(2) and that Messier allegedly exercised control over Vivendi's actions, Messier's motion to dismiss the § 15 claim against him must fail.

■ Like Messier, Hannezo attempts to conflate the requirements of § 20(a) with the requirements of § 15. Because plaintiffs have adequately alleged a primary violation of the Securities Act, the only issue left to determine with respect to this claim is whether plaintiffs have alleged sufficient facts to establish that Hannezo was a "controlling person" within the meaning of § 15. Here, plaintiffs allege Hannezo served as Vivendi's chief financial officer ("CFO"), who closely collaborated with Messier. Compl. ¶ 33. In addition, Hannezo allegedly signed the Form F–4 that Vivendi issued to solicit approval from Vivendi's shareholders of a 3–way merger with Canal Plus and Seagram. *Id.* ¶ 54. The Form F–4 and the Form 20–F, the contents of which Hannezo apparently approved by signing it, is alleged to be false and misleading because it improperly consolidated financial revenues from various subsidiaries. *Id.* ¶¶ 55, 66, 72. Hannezo's status as CFO combined with allegations of his close collaboration with his long-time friend, Messier, and apparent approval of the allegedly misleading Form F–4 and Form 20–F, suffice to create a reasonable inference that Hannezo very likely exercised control in the actions taken by Vivendi to violate § 11 and § 12(a)(2). *See In re IPO*, 241 F.Supp.2d at 352 n. 85; *see also In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F.Supp.2d 741, 770 (S.D.N.Y.2001); *Gabriel Capital, L.P.*, 122 F.Supp.2d at 426–27. Accordingly, defendants' motion to dismiss the § 15 claim against Hannezo is denied.

## H. Claims Under § 20 of the 1934 Act Against Messier & Hannezo

### 1. Legal Standard To Plead A § 20 Claim

■ "In order to establish a *prima facie* case of controlling-person liability [under § 20], a plaintiff must [ (1) ] show a primary violation by the controlled person[,] ... [ (2) ] control of the primary violator by the targeted defendant, ... and [ (3) ] show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *First Jersey*, 101 F.3d at 1472 (internal quotation marks and citation omitted). Messier states that plaintiffs fail to allege his culpable participation with particularity for § 20 control liability.

Courts in this district have adopted various standards to plead culpable participation. *See, e.g., Steed Fin. LDC v. Nomura Securities Intern., Inc.*, 2001 WL 1111508, at *10 (S.D.N.Y. Sept.20, 2001) ("either conscious misbehavior or recklessness"); *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 426–28 (S.D.N.Y.2000) ("facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom the person had control, was engaging in fraudulent conduct"); *Mishkin v. Ageloff*, 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23, 1998) ("particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud"). At bottom, plaintiffs must plead facts showing either conscious misbehavior or recklessness by the defendant.

The degree of particularity that must be plead as to culpability, however, is not entirely clear. *Compare In re Deutsche Telekom*, 2002 WL 244597, at *7 (finding heightened pleading requirement of the PSLRA applies to § 20(a) claim), *with In re IPO*, 241 F.Supp.2d at 396 (holding that

a § 20(a) claim in complaint must merely comport with Rule 8(a)). When faced with an appeal from a district court decision on a motion to dismiss a § 20(a) claim, the Second Circuit held that allegations of control coupled with an underlying violation sufficed to withstand such a motion. *See Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001). There, the defendant was alleged to be "an officer of the Bank and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group." *Id.* (internal references omitted). These allegations, although "somewhat broad" according to the Second Circuit, were deemed "sufficient to plead controlling-person liability" under § 20(a). *Id.* Because the plaintiffs' broad allegations were sufficient there to withstand a motion to dismiss without more particularized allegations, I conclude that a § 20(a) claim needs to be pled only in accordance with Rule 8(a). *See also In re IPO,* 241 F.Supp.2d at 396.

### 2. Section 20(a) Claim Against Messier and Hannezo

Here, plaintiffs allege in numerous places throughout the complaint, how Messier, disseminated false and misleading statements in his capacity as CEO of Vivendi, when he knew of or recklessly disregarded non-public information, which would have shown that his statements were false and misleading. *See* Compl. ¶¶ 38, 59–62, 68, 72, 81–82, 87–89, 93; Part IV.E(6)(b). These allegations suffice to state a claim against Messier under § 20(a). *See Ruskin v. TIG Holdings, Inc.,* 2000 WL 1154278, at *7–8 (S.D.N.Y. Aug. 14, 2000); *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d. 283, 298 (S.D.N.Y.1999); *In re Leslie Fay Companies, Inc. Sec. Litig.,* 918 F.Supp. 749, 762–63 (S.D.N.Y.1996).

■ Hannezo similarly contends that plaintiffs have not adequately pled facts to establish Hannezo's control liability under § 20(a). Like the § 20(a) claim against Messier, I need to determine only whether Hannezo was a culpable participant. Here, plaintiffs have sufficiently pled facts supporting an inference of Hannezo's culpable participation by virtue of his position as CFO and his responsibility for approving Vivendi's false financial statements, when he knew or should have known of facts indicating that these statements were inaccurate and misleading. *See* Compl. ¶¶ 9, 54–55, 66, 72, 102, 108, 141–145, 183(b) & (c)(i), 184, 188. Accordingly, Hannezo's motion to dismiss the § 20(a) claim against him is denied.

### I. Hannezo's Violation of § 10(b) of the 1934 Act and Rule 10b–5

■ Hannezo contends that the § 10(b) and Rule 10b–5 claims against him must be dismissed because the complaint fails to allege that he made an actionable misstatement or omission. Hannezo does not dispute that he executed Forms 20–F and F–4, which plaintiffs have adequately alleged to contain false and misleading financial statements. *See supra* Part IV. D(1), Compl. ¶¶ 66, 132–38. Accordingly, Hannezo's first ground to dismiss the § 10(b) claim and Rule 10b–5 claims must be denied. Putting aside the forms executed by Hannezo and filed with the SEC, Hannezo contends that he may not be held liable for the other statements released by other defendants. Plaintiffs assert that Hannezo may be held liable under § 10(b) and Rule 10b–5 under the "group pleading doctrine." Under this doctrine, plaintiffs may "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases or other group-published information, are the collective work of those individuals with

direct involvement in the everyday business of the company." *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint." *Elliott Associates, L.P. v. Covance, Inc.*, 2000 WL 1752848, at *12 (S.D.N.Y. Nov. 28, 2000).

Hannezo argues that this doctrine may not be used to impose liability under § 10(b) or Rule 10b–5, in view of the decisions by the United States Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) and the Second Circuit in *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997) and *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir.1998). More specifically, defendants contend that plaintiffs, through use of the group pleading doctrine, seek to impose liability on the basis that he allegedly aided and abetted others who manipulated or committed deceptive acts in connection with the purchase or sale of Vivendi securities. The United States Supreme Court, however, held that § 10(b) liability based on aiding and abetting others is not permitted. *See Central Bank*, 511 U.S. at 166, 191, 114 S.Ct. 1439. According to Hannezo, the Second Circuit adopted a bright line standard, in which the charged defendant "must actually make a false or misleading statement in order to be held liable under Section 10(b)." *See Shapiro*, 123 F.3d at 720. In *Shapiro*, the Second Circuit held that the plaintiffs' allegations in connection with the failure to disclose material information serve to support only aiding and abetting liability, because the defendant–a non-fiduciary accounting firm–did not have a duty to disclose certain material information. *Id.* at 721. Similarly, the Second Circuit in *Wright v. Ernst & Young LLP* affirmed that second-

ary actors, such as non-fiduciary accountants, who were merely affiliated with the defendant corporation, must actually make a false or misleading statement in order to be held liable under § 10(b). 152 F.3d at 175. Courts after *Central Bank, Shapiro* and *Wright*, have recognized that "primary liability under Rule 10b–5 [and section 10(b) ] may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.' " *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142 (quoting *In re Health Management, Inc. Securities Litig.*, 970 F.Supp. 192, 208–09 (E.D.N.Y.1997)); *see also First Jersey*, 101 F.3d at 1471–72 (holding that plaintiffs need not allege that a particular defendant made any fraudulent statements to be held liable under § 10(b)). Thus, a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under § 10(b) and Rule 10b–5. *Rich v. Maidstone Fin., Inc.*, 2002 WL 31867724, at *8–9 (S.D.N.Y. Dec.20, 2002); *In re Livent, Inc. Noteholders Sec. Litig.*, 174 F.Supp.2d 144, 154 (S.D.N.Y.2001) (citing *First Jersey*, 101 F.3d at 1471 and *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that neither the PSLRA nor *Central Bank* and its progeny affect its vitality. *In re CINAR Corp. Securities Litigation*, 186 F.Supp.2d 279, 318–19 (E.D.N.Y.2002); *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 142; *In re Health Management, Inc. Securities Litig.*, 970 F.Supp. at 208–09. Unlike the accountants in *Shapiro* and *Wright*,

Hannezo was not a person merely affiliated with the defendant corporation, but rather was a "clearly cognizable corporate insider[ ] with [an] active daily role[ ]" as CFO of Vivendi. *Polar Int'l Brokerage Corp.*, 108 F.Supp.2d at 237; Compl. ¶ 35. I find no reason to preclude plaintiffs from relying on the group pleading doctrine to attribute to Hannezo the allegedly false and misleading press releases and other group-published documents produced by other defendants during Hannezo's tenure as CFO. I agree, however, that oral statements made by other individual defendants do not fall within the ambit of the group pleading doctrine, and hence, oral statements made by Messier may not be attributed to Hannezo. *See Elliott Assocs.*, 2000 WL 1752848, at *12.

### J. Leave to Amend The Complaint

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991). While I find certain elements of plaintiffs' complaint insufficient, I "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege his claims." *Protter v. Nathan's Famous Sys., Inc.*, 904 F.Supp. 101, 111 (E.D.N.Y.1995). Plaintiffs are granted leave, if they choose to do so, to file an amended complaint within twenty days of the date of this Order with respect to: (1) Vivendi's liability under § 14(a), (2) the clerical error made in paragraph 174 of the original complaint, and (3) the § 12(a)(2) claim against Hannezo.

### V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' § 14(a) claim against Vivendi, and § 12(a)(2) claim against Hannezo is granted, with leave to replead within 20 days hereof, if deemed necessary. Additionally, plaintiffs' claim for damages under § 11 and § 12(a)(2) arising from the purchase of Vivendi's ADSs, pursuant to the Form F–6 is barred. Defendants' motion to dismiss plaintiffs' other claims is denied.

**SO ORDERED.**